Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KURT M., individually and on behalf of J.M. a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>REGENCE BLUESHIELD of IDAHO,<br><br>Defendant. | COMPLAINT<br><br>Case Number 2:19-cv-00381 DAK |

Plaintiff Kurt M. ("Kurt") individually and on behalf of J. M. ("J.") a minor, through his undersigned counsel, complains and alleges against Defendant Regence BlueShield of Idaho ("Regence") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Kurt and J. are natural persons residing in Ada County, Idaho. Kurt is J.'s father.

2. Regence is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers, and was the insurer and claims administrator for the insurance plan ("the Plan") providing coverage for Kurt and J. during the treatment at issue in this case.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Kurt was a participant in the Plan and J. was a beneficiary of the Plan at all relevant times.

4. J. received medical care and treatment at Outback Therapeutic Expeditions ("Outback") from May 8, 2015, to July 15, 2015, and Waypoint Academy ("Waypoint") from July 16, 2015, to July 29, 2016. These are treatment facilities located in Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Regence denied claims for payment of J.'s medical expenses in connection with his treatment at Outback and Waypoint. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Kurt for the medical expenses he has incurred and paid for J.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Regence does business in Utah, and the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### J.'s Developmental History and Medical Background

9. When J. was a young child, he was easy going and made friends easily. In the first grade he was tested and was placed in the gifted program. J. was also very involved in athletics and enjoyed playing football and baseball.

10. J. was extremely manipulative and often pitted his father and mother against each other. J.'s parents separated while he was still in elementary school, which was a traumatic event for J. When J. was ten, he wrapped a computer cord around his neck and threatened to commit suicide. J. received a police escort to the emergency room and was admitted to the behavioral health unit for three nights. After this incident, J. became more subdued and he continued to struggle with depression.

11. In the seventh grade, J.'s grades began to slip and Kurt discovered that J. had been the target of serious bullying. On the recommendation of school personnel and J.'s therapist, J. was pulled from school. J. was then briefly homeschooled before he was transferred to a new middle school. J. became increasingly obsessed with video games around this time period and would isolate himself in his room playing obsessively. His habit eventually escalated to the point that he would even steal money from his parents to buy more games.

12. J. would go to his guidance counselor's office and would spend the majority of his school day there, saying he was uncomfortable going to class. His counselor tried to encourage

J. to attend his classes, but he refused. J. told his counselor that he had thoughts of killing himself and he was again hospitalized, this time for a week.

13. Afterwards, J. returned to school, but had the same issues with anxiety, isolating, and school attendance. Kurt consulted with J.'s treatment team who recommended that he be sent to Outback.

## Outback

14. J. was admitted to Outback on May 8, 2015. Regence initially denied payment for J.'s treatment under code L55: "This is not a covered service. Refer to specific exclusion section in member's benefit plan. You are responsible for these services."

15. On July 11, 2017, Kurt submitted a level one appeal of the denial of J.'s treatment at Outback. Kurt argued that the terms of the Plan contained no exclusions for the outdoor behavioral health services J. received at Outback. He wrote that instead the Plan "covers both inpatient and outpatient mental health and chemical dependency services received from preferred, participating, and nonparticipating providers at all levels of care."

16. He wrote that Outback met the Plan's definition of a provider, and while it was not a traditional residential treatment program, it was instead a licensed outdoor behavioral health program which was still a covered service under the Plan. He asserted that Outback was duly licensed by the State of Utah to provide intermediate level outdoor youth treatment and that MHPAEA prohibited Regence from discriminating against a provider licensed by the state to provide a service that was covered under the Plan.

17. He contended that MHPAEA required Regence to provide coverage of its mental health services "at parity" with an analogous level of medical or surgical services. He wrote that because the Plan covered other intermediate level medical or surgical services such as

4

skilled nursing or rehabilitation facilities, MHPAEA compelled it to also offer coverage for the intermediate level mental health services provided at Outback.

18. He asked that Regence respond to each of the arguments that he had raised, and in the event that it maintained the denial that it tell him which of the specific Plan provisions it relied upon to come to the decision to deny care, and how it determined that coverage was not mandated under MHPAEA.

19. He asked that in the event that Regence maintained its denial that it provide him with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, the Plan's mental health and substance abuse criteria, the Plan's criteria for skilled nursing and rehabilitation facilities, any reports or opinions from any physician or other professional about the claim, and the names, qualifications, denial rates of all individuals who reviewed the claim or were consulted about the claim. (collectively the "Plan Documents")

20. In a letter dated August 7, 2017, Regence upheld the denial of payment for J.'s treatment at Outback. The reviewer gave the following new justification for the denial:

> …Your contract excludes coverage for specific mental health conditions, and one of these excluded conditions is parent/child relational difficulties. Our review found [J.]'s treatment was for an excluded condition, and as a result, your appeal for coverage is denied. …

21. On October 3, 2017, Kurt submitted a level two appeal of the denial of J.'s treatment at Outback. He wrote that Regence had failed to take into account J.'s whole diagnoses when it came to the decision to deny care. He stated that J. suffered from multiple diagnosed disorders, but that Regence had denied payment based solely on Parent/Child

Relational Difficulties, one of J.'s secondary diagnoses, while ignoring his other mental health conditions.

22. Kurt contended that Regence's denial violated parity laws and reiterated that J.'s treatment at Outback was medically necessary and was required by MHPAEA.

23. He wrote that J.'s medical records supported the fact that J.'s primary diagnoses were depression, anxiety, and an impulse control disorder. Kurt took issue with the shift in Regence's denials in each of its letters and stated that it "comes across as a cynical maneuver to avoid your duty as a fiduciary." Kurt asked Regence to clarify whether J.'s treatment was denied due to one of J.'s diagnoses or because the treatment at Outback was an excluded service. Kurt again requested to be provided with a copy of the Plan Documents.

24. On November 1, 2017, Regence sent Kurt a letter upholding the denial of payment for J.'s treatment at Outback. The letter stated that the decision was made by a panel composed of "a Regence Medical Director who is Cardiologist [sic] and a an [sic] Administrative Representative who is a Supervisor of Member Services." The letter gave the following justification for the denial:

> …Before the Member Appeal Panel reviewed your appeal, it was sent for specialty match review by a Physician Reviewer who specializes in Psychiatry, who determined the condition for which [J.] received treatment from 5/8/15 to 7/15/15 is excluded from coverage based on the plan language.
>
> However, after reviewing the complete appeal file, the Panel agreed that because [J.] was treated for multiple conditions, the above exclusion should not be applied.[1] They consulted with another physician who specializes in Psychiatry, Child & Adolescent, who confirmed that Outback Therapeutic Journeys is licensed to provide outdoor youth treatment for youth clients age 13-17; they are not licensed as a residential treatment facility, and as such, treatment from their facility is excluded from coverage by the Plan.

---

[1] It appears that this statement is in reference to Regence's August 7, 2017, denial letter for Kurt's level one appeal. These reviewers appear to have deemed Regence's previous rationale for denial to be invalid.

6

> After considering all of the information sent in for review, our previous denial decisions, and the recommendations from the specialty matched physicians, the Panel determined that the appropriate denial is the exclusion of coverage for wilderness programs. Because of this denial reason, the medical necessity or appropriateness of this treatment was not considered with this appeal review. We recognize that the change in rationale for denial at the previous appeal level may have caused some confusion, but the original claims denial was correct. If you feel that change in rationale [sic] at the previous level did not provide you with an adequate opportunity to argue the appeal appropriately, the Panel would be willing to reopen this appeal to consider new information if you make that specific request. …

25. Regence provided a limited selection of some of the Plan Documents that Kurt requested such as the names and qualifications of its reviewers, but it did not respond to many of the points Kurt had raised in his earlier appeals, such as asking Regence how its decision was in compliance with MHPAEA and did not provide the other Plan Documents.

26. J.'s discharge summary from Outback stated in part:

> Following his placement at Outback Therapeutic Expeditions, it is strongly recommended that [J.] transition to a higher level of care and be enrolled in a structured residential placement. [J.] needs a 24-hour supervised, clinically structured milieu with both Psychiatric oversight and intensive clinical involvement. Without this high level of structure, [J.] is likely to return to previous patterns of depression, social isolation, anxiety and electronics abuse, ultimately putting his safety at risk.

**Waypoint**

27. J. was admitted to Waypoint on July 16, 2015, directly following his treatment at Outback.

28. In a letter dated July 20, 2015, Regence denied payment for J.'s treatment at Waypoint. This letter, as well as all future denials, referred to Green Valley Academy instead of Waypoint. The letter listed the denial dates incorrectly and gave the following justification for the denial:

7

> …Following a review of the information available, our physician advisor(s) determined that we are unable to authorize the above service(s) because we do not have the necessary clinical information to determine whether medical necessity was met. Coverage of treatment is authorized only for services documented to be medically necessary. As a result, payment is denied for services from July 17, 2015 and forward. The criteria used in this decision: MCG, 19th edition: Residential Acute Behavioral Health Level of Care, Child or Adolescent, ORG: B-902-RES. …

29. On January 5, 2016, Kurt submitted a level one appeal of the denial of J.'s treatment at Waypoint. Kurt pointed out that while J. was admitted to Waypoint on July 16, 2015, the denial letter only denied treatment from July 17, 2015, forward. This date was listed in error, as Regence did not pay for or authorize any of J.'s treatment.

30. Kurt also took issue with the criteria Regence used to evaluate the medical necessity of J.'s treatment. He argued that not only had he not been provided with a copy of the acute criteria Regence used, but they were incorrectly applied to J.'s treatment, as it was inappropriate to use acute level criteria to evaluate treatment at a non-acute level of care.

31. Kurt included several letters of medical necessity as well as a copy of J.'s medical records with the appeal. In an undated letter Dr. Allyson Van Steenbergen M.D. wrote in part:

> [J. M.] is my pediatric patient. He has been diagnosed with major depressive disorder. He was admitted to an inpatient psychiatric unit in 2013 for suicidal ideation. He has received outpatient counseling from a number of different counselors over the past few years. He also was being treated with antidepressants by psychiatry. Despite this, he remained depressed, manipulative, suicidal, and refused to attend school. Because these treatment options failed, he was enrolled in Outback Therapeutic Expeditions. He attended this program from 5/8/2015 until 7/15/2015. During this time he was diagnosed with chronic depression and anxiety to the point that it has affected his ability to attend to the tasks of daily living and to maintain relationships. It was their determination that he needed long term residential care.
>
> I feel it is in [J.]'s best interest to continue with residential treatment. I am very concerned that if he does not get the help he needs he will be a suicide risk. Boise, Idaho does not have any local programs that could help him or keep him safe. I

am optimistic that with the right program and good therapeutic support he could improve.

Educational and Therapeutic Consultant Douglas Bodin wrote in part in a letter dated

August 6, 2015:

> It is my recommendation that [J. M.] continue inpatient/residential treatment for anxiety and depression at Waypoint Academy, as I believe this offers the best opportunity for his ongoing clinical needs.

In a letter dated August 20, 2015, Jason Calder LMFT, CMHC, wrote in part:

> [J.]'s enrollment at Outback and his subsequent enrollment at Waypoint Academy became necessary because all other treatment options and levels of care that his family had tried in the past were unsuccessful in ameliorating [J.]'s symptoms. It became apparent that [J.] needed more consistent structure and a higher level of care.
>
> During the 68 days that [J.] attended Outback Therapeutic Expeditions he was thoroughly assessed and it was determined that he has struggled with protracted Depression and Anxiety for quite some time. These mental health disorders have debilitated [J.] to the extent that he was unable to fulfill tasks of daily living or maintain basic relationships. Though he made progress during his stay at Outback it was quite apparent that [J.] was in need of a longer-term, residential level of care. This recommendation thus led to his enrollment at Waypoint Academy. Again, it is this author's professional opinion that a residential placement was necessary to give [J.] the therapeutic support he needed for long-term success.

In a letter dated September 1, 2015, Licensed Clinical Psychologist, Sheila Sturgeon

Freitas Ph.D. wrote in part:

> [J.]'s symptoms profoundly interfered with basic tasks of daily-life, his education, his friendships and his family life. Although a likeable and intellectually gifted child, [J.] was self-destructing in all possible ways. I saw [J.] a total of 12 times between the dates of December 2, 2014 and April 7, 2015. He remained in crisis much of the time. I would receive phone calls from his mother sitting in the car in front of the school with a child who was profoundly suicidal. He was always adamant that he had to go to the hospital rather than walk inside [his school]. Outside of his experiences within the hospital, [J.] was unable to engage in any form of treatment. He had worked with numerous previous therapists, refusing treatment with all of them. It was obvious that a more intensive treatment program was what he needed (and was requesting for) and that this was a life-or-death situation. By all reports, [J.] has made progress in his treatment at Outback Therapeutic Expeditions, but still requires intensive therapeutic support for long-

term success. A residential setting that can concurrently supports [sic] his continued involvement in academics is medically necessary for [J.] to continue to make progress in his treatment.

32. Kurt argued that every medical professional that had worked directly with J. had recommended residential treatment as the most appropriate treatment modality to successfully resolve J.'s underlying behavioral and mental health issues. He asked that in the event that the denial was maintained that Regence disclose what deference, if any, was given to the opinions of these medical professionals and the medical record.

33. In a letter dated February 11, 2016, Regence upheld the denial of payment for J.'s treatment. The letter again listed the incorrect dates of service and gave the following justification for the denial:

> …After a doctor's review, we cannot approve payment for all of the above service(s) because the information we have received shows it was not medically necessary because:
>
> - you were not a danger to yourself or others
> - your risk status was manageable,
> - you did not require around-the-clock medical or nursing care, you could have been treated in a less intensive setting, such as an outpatient program.
>
> Your condition did not meet the criteria for coverage of a continued stay at the mental health residential level of care. Payment is denied for services from 7/17/15 forward. The criteria used in this decision: MCG, 19th edition: Residential Acute Behavioral Health Level of Care, Child or Adolescent…

34. The denial was signed by Medical Director Csaba Mera, the same person who signed the initial July 20, 2015, denial.

35. On June 21, 2016, Kurt submitted a level two appeal of the denial of J.'s treatment at Waypoint. Kurt argued that the denial rationales he had received had essentially the same reasoning, which was "[n]ot surprising, I suppose, since both were written by Dr. Mera." He argued that Regence's denial was not in accordance with ERISA guidelines and that

Regence had not addressed many of the arguments raised in his level one appeal, including what he described as the inappropriate use of acute care guidelines to evaluate the non-acute level of care J. was receiving.

36. Kurt questioned why Regence refused to utilize the correct criteria and why it continued to require acute symptomology such as "you were not a danger to yourself or others." He wrote that he was having to reargue points such as Regence's misapplication of acute criteria when he had already discussed these arguments thoroughly in his level one appeal, simply because Dr. Mera and Regence neglected, "to effectively and thoroughly read, process and understand [the level one appeal]." He wrote that Regence's use of acute care guidelines to evaluate a non-acute service conflicted with generally accepted standards of medical practice.

37. Kurt argued that residential treatment was the appropriate level of care for J., that it was the level of care supported by his treatment team, and that J. met the Plan's criteria for this level of care. He asserted that the care provided at Waypoint was congruent with industry standards such as those set by the American Academy of Child and Adolescent Psychiatry and was not custodial in nature.

38. In a letter dated July 27, 2016, Regence upheld the denial of payment for J.'s treatment. The reviewer gave the following justification for maintaining the denial:

> …According to the medial [sic] records received, as of July, [sic] 15, 2015, it is documented that [J.]'s condition (psychiatric and medically) is stabilized. This indicates that safe treatment could have been provided in a less restrictive setting with individual, group, family therapies and active psychiatric medical management. It is also documented that [J.] was considered sufficiently stable by the attending psychiatrist at the facility, to have required psychiatric visits only every 2-4 weeks and to not have any required psychotropic medicine changes throughout his stay. Therefore, [J.]'s condition did not meet the MCG guidelines for residential level of care.

> Additionally, [J.] could have received intensive outpatient therapies over summer 2015 prior to gradual re-integration into school that fall 2015, using established behavior protocols for students with prior school refusal anxiety if needed.
>
> Based on this information, we consider [J.]'s residential treatment after July 15, 2015 and forward as not medically necessary. Medically necessary services are those that are in accordance with generally accepted standards of medical practice; clinically appropriate and effective for patient's illness, injury or disease; and not primarily for convenience or more costly than any alternative services that will produce equivalent therapeutic or diagnostic results. Your contract excludes services that are deemed not medically necessary. As a result, the request to cover [J.]'s residential mental health services from July 17, 2015 forward is denied. …

39. In a letter dated November 10, 2016, Kurt requested that the denial of J.'s treatment be evaluated by an external review agency.

40. Kurt contended that Regence had not supplied him with information that it was required to provide under ERISA. He wrote that Regence's determination that J. care was not medically necessary directly conflicted with the opinions of the medical professionals that had treated J. directly. Kurt reiterated that J.'s medical records showed that he was profoundly suicidal. He questioned how Regence determined how a condition of such severity could have been resolved on the day of J.'s admission to Waypoint.

41. He contended that Regence had attempted to minimize the severity of J.'s mental health conditions by classifying them simply as "school refusal anxiety." He noted that J.'s symptoms were severe enough to require acute hospitalization. In addition, outpatient services had been attempted numerous times prior to J.'s admission to Waypoint, and it was only after these attempts at treatment at a lower level of care had failed that J. was admitted to residential treatment.

42. Kurt stated that the treatment team that had worked intimately with J. at Waypoint did not feel that he was ready for discharge until July 29, 2016.

12

43. Although Kurt requested that his appeal be evaluated by an external review agency, in a letter dated January 3, 2017, Regence reviewed Kurt's appeal using a panel of two of its employees. Regence's letter continued to list the incorrect dates of service and continued to rely on acute criteria to evaluate J.'s non-acute residential treatment.

44. The panel members wrote that prior to its decision, the appeal had been sent out for specialty match review to physician reviewer Paul Hartman M.D. who stated that care should be denied because J. was not self-harming, was not suicidal or homicidal, was able to take care of his activities of daily living, had no substance abuse issues, and was medically stable. The reviewer has the same qualifications as the reviewer in the July 27, 2016, letter, but as that reviewer is unnamed, it is unknown if they are the same individual.

45. The panel noted that J. had spent some time in a wilderness program prior to his treatment at Waypoint and that he had "no indication of acute anxiety or depression." They wrote that there was no evidence that J.'s medications or dosage was changed in 2015.

46. They quoted notes from October of 2015 which described J. as euthymic and then quoted from another note on December 7, 2015, that described him as stable, with a congruent affect, no suicidal or homicidal ideation, no psychosis, no medication change, eating and sleeping well, and again having a euthymic mood.

47. The letter stated: "The Panel determined that although [J.] may have been having some behavioral issues, they did not require 24 hour supervision by a clinician at the residential level of care. Therefore, his treatment from July 17, 2015 to July 29, 2016 was not medically necessary."

48. The letter further stated that although Dr. Mera's name was on two denial letters, he was not the reviewing physician for either case. The letter did not discuss the other ways that Kurt had alleged his ERISA rights had been violated in his appeals. The letter informed Kurt that he had the right to request that his claim be evaluated by an external review agency.

49. On April 28, 2017, Kurt again requested that the denial of J.'s treatment be evaluated by an external review agency. He pointed out that his previous external review request had instead been evaluated internally by Regence. He wrote that he was concerned that Regence continued to use acute care criteria to evaluate J.'s treatment. He pointed out that residential treatment "always involves a subacute level of care," and that admitting patients with acute symptomology into a sub-acute environment, "would be a gross violation of medical standards in mental health treatment," and was not allowed or recommended by any valid psychiatric criteria.

50. He asserted that the weekly group note that Regence had selected was comprised of only three group sessions; he wrote that this was "hardly what I would deem a representative sample for gauging the mood and behaviors of any one individual," and did not provide a sufficient basis for insights on which to base a denial of coverage for medical services. He argued that the medical record continued to demonstrate the medical necessity of J.'s treatment and those records chronicled his ongoing mental illnesses.

51. He took issue with Regence's requirement that J.'s medications be constantly adjusted. He asked why a medication regimen would be changed after it was proven to be consistently effective and questioned whether Regence would have approved J.'s

treatment if his provider had changed or discontinued his medications even though it was not medically necessary to do so.

52. He referred to the MCG criteria utilized by Regence as "on their face, inoperative and unsound," and wrote that even under these criteria there was no mention of medication management requirements or specific timeframes regarding psychiatric appointments. He stated that it appeared that Regence's reviewers were not using objective clinical standards to deny J.'s care, but instead relied on their own personal judgment.

53. In a letter dated June 26, 2017, External Review Agency MCMC upheld the denial of payment for J.'s treatment at Waypoint. MCMC provided a brief summary of its determination to deny care. The summary again denied care for the incorrect dates of service. The summary gave the following justification for the denial:

> **Main conclusions**:
> - "No, [the health plan should not cover the requested health service.]"[2]
> - "At the time of his admission to the residential program, the patient was an ideal candidate for ongoing outpatient individual and family psychotherapy with a competent child/adolescent therapist."
> - "There was no evidence of significant acting out behaviors. There was no evidence that he could not, at that time, respond to outpatient treatment or required a more intensive level of care."

54. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

55. The denial of benefits for J.'s treatment was a breach of contract and caused Kurt to incur medical expenses that should have been paid by the Plan in an amount totaling over $233,000.

//

//

---

[2] Bracketed text in original

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

56. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Regence, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

57. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

58. Regence and the agents of the Plan breached their fiduciary duties to J. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of J.'s claims.

59. The actions of Regence and the Plan in failing to provide coverage for J.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

60. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

61. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

62. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

63. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

64. Specifically, the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria applied to intermediate level medical or surgical benefits.

65. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for J.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Regence exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Regence excluded coverage of treatment for J. at Outback and Waypoint.

66. The actions of Regence and the Plan requiring that J. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

67. Regence and the Plan continued to use acute criteria – even specifying that J. did not suffer from "acute anxiety or depression" – in spite of the fact that Kurt repeatedly asserted that acute criteria was not an appropriate metric to evaluate treatment at a non-acute level of care. Although Kurt argued this repeatedly in numerous appeals, Regence time and again failed or refused to acknowledge or dispute Kurt's argument that its criteria were inappropriate. Nor did Regence attempt to address in any substantive capacity, Kurt's allegations that it was not otherwise in compliance with MHPAEA.

68. The actions of Regence and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

69. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Regence, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and

more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

70. When Regence and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Regence and the Plan evaluated J.'s mental health claims under a more restrictive standard than generally accepted standards of medical practice. This process resulted in a disparity where equivalent mental health benefits were denied when the analogous levels of medical or surgical benefits would have been paid.

71. The violations of MHPAEA by Regence and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendant violate MHPAEA;

   (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

   (e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan and Regence insured plans as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

72. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for J.'s medically necessary treatment at Outback and Waypoint under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 31st day of May 2019.

By   s/ Brian S. King
     Brian S. King
     Attorney for Plaintiffs

County of Plaintiffs' Residence:
Ada County, Idaho.